# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

BARRIO BROS., LLC, et al.,

           **Plaintiffs,**

-vs-

REVOLUCION, LLC, et al.,

           **Defendants.**

CASE NO. 1:18-CV-02052

JUDGE PAMELA A. BARKER

MEMORANDUM    OPINION    AND ORDER

Currently pending are (1) Plaintiffs Barrio Bros., LLC's, Justin Hughes, LLC's, Tres Amigos Lakewood, LLC's, Thomas Leneghan's, and Sean Fairbairn's (collectively, "Plaintiffs") Motion for Partial Summary Judgment (Doc. No. 137-1); and (2) Defendants Revolucion, LLC's, Revolucion Holdings, Inc.'s, Cassyck, LLC's, Joseph Kahn's, Condado Tacos 1, 2, 4, 5, 6, 7, 8, LLCs', Jonathan D. Adams's, and Thomas J. DeSantis's (collectively, "Defendants") Motion for Summary Judgment (Doc. No. 114). Briefs in Opposition were filed on April 5, 2021. (Doc. Nos. 121, 122.) Both sets of parties filed replies in support of their respective Motions on April 29, 2021. (Doc. Nos. 126, 127.) For the following reasons, Plaintiffs' Motion for Partial Summary Judgment is DENIED, and Defendants' Motion for Summary Judgment is GRANTED, as set forth herein.

## I.    Background

In 2012, two business partners, Thomas Leneghan ("Leneghan") and Joseph Kahn ("Kahn"), opened a build-your-own taco restaurant with a Day of the Dead "theme" called Barrio in Cleveland's Tremont neighborhood. (Doc. No. 53, ¶¶ 24-27.) Both Leneghan and Kahn had an ownership interest in Barrio through the limited liability company, Justin Hughes, LLC, which owns and operates the

Barrio Tremont location.  (Kahn Depo., Doc. No. 135-1, PageID# 2738-39.)  Leneghan's and Kahn's partnership was brief and ended in an acrimonious, bitter split that has spawned years of rancorous litigation in both state and federal courts.  (Leneghan Depo., Doc. No. 136-1, PageID# 3004-06.)

## A.    Creation of Barrio Tremont

Around 2012, Leneghan began exploring the idea of opening a Mexican restaurant at 806 Literary Road[1] in Cleveland's Tremont neighborhood.  (Doc. No. 136-1, PageID# 2994.)  Around the same time, Kahn approached Leneghan to inquire whether he would lease Kahn the 806 Literary Road space for a deli-style restaurant concept Kahn was interested in developing.  (Doc. No. 135-1, PageID# 2733-34.)   Leneghan declined Kahn's deli idea but offered Kahn the opportunity to go into business with Leneghan as he, Leneghan, developed his idea for a Mexican restaurant.  (*Id.* at PageID# 2735-36.)  Kahn accepted Leneghan's offer.  (*Id.*)

Leneghan offered to lease 806 Literary Road to Kahn for the purpose of operating a Mexican restaurant on the premises.  (*Id.* at PageID# 2736.)  Leneghan also offered Kahn the opportunity to buy into the restaurant via Justin Hughes LLC, as well as the opportunity to become Justin Hughes, LLC's operating partner.  (*Id.* at PageID# 2736-37.)  Kahn purchased six percent of Justin Hughes, LLC via Cassyck, LLC, a limited liability company of which Kahn and his wife, non-party Julie Kahn, are members.  (*Id.* at PageID# 2738; *see also* Doc. No. 112-1, PageID# 1211-35, Kahn Depo. Ex. 3.)  Leneghan owned the remaining ninety-four percent of Justin Hughes, LLC.  (*Id.* at PageID# 1215.)

Leneghan, Kahn, and several non-parties to this suit brainstormed ideas for Barrio Tremont. (Doc. No. 135-1, PageID# 2741; Doc. No. 136-1, PageID# 2994.)  Kahn combined his and others'

---

[1] Leneghan owns the real property at 806 Literary Road via Sandy Banks LLC, of which he is the sole member.  (Leneghan Aff., Doc. No. 137-2, ¶¶ 11-12.)

ideas into a document called "Introducing Barrio," which set out what Leneghan and Kahn, through Justin Hughes, LLC, envisioned for their restaurant. (Doc. No. 135-1, PageID# 2740; Doc. No. 136-1, PageID# 2997.) Leneghan and Kahn decided that Barrio should target the "hipsters" that lived in Tremont—*i.e.*, "single, young, urban middle class adults with expendable incomes." (Doc. No. 112-1, PageID# 1200.) To target these hipsters, Leneghan and Kahn concluded that Barrio should have a "hip, exciting, yet comfortable environment." (*Id.*)

In deciding how best to manufacture this desired hip environment, Leneghan and Kahn drew influences from other trendy restaurants from across the region. (*Id.*; Doc. No. 136-1, PageID# 2992, 2995.) According to Leneghan, they "wanted to take things from everywhere and create a very distinct brand." (Doc. No. 136-1, PageID# 3001.) For example, Leneghan and Kahn derived Barrio's "chit" menu—a paper checklist that patrons use to customize their desired tacos—from a similar checklist menu utilized by Happy Dog, a Cleveland-based bar and restaurant that specializes in build-your-own hot dogs. (Doc. No. 136-1, PageID# 2992; Doc. No. 135-1, PageID# 2762.) Additionally, Leneghan sought to evoke a cool "Mexican flare" and fun, energetic vibe like that of Momocho, a Cleveland-based Mexican restaurant, and Mad Mex, a chain of Pittsburgh, Pennsylvania-based Mexican restaurants.[2] (Doc. No. 136-1, PageID# 2995.) Kahn suggested that Barrio serve its beer and margaritas in mason jars, an idea that he took from Edison's Pub in Tremont (where he previously worked as a manager), because they were "very hard to break," "they were cheap," and he thought "the mason jars were cool." (Doc. No. 135-1, PageID# 2743.) Kahn took a music playlist that he had created for Edison's and used it at Barrio. (*Id.*) Moreover, Barrio's logo is nearly identical to that of another chain of Mexican restaurants—also called "Barrio"—based in Minneapolis,

---

[2] According to both Leneghan and Kahn, Leneghan liked the green tabletops at Mad Mex so much that he suggested Barrio Tremont also use green tabletops. (Doc. No. 135-1, PageID# 2743; Doc. No. 136-1, PageID# 2996.)

Minnesota. (Doc. No. 136-1, PageID# 3002.) The Minneapolis Barrio logo is simple: the word "barrio" in lowercase letters written in a gothic serif font. (*Id.*) The Barrio Tremont logo is nearly identical. (*Id.*) The word "barrio" is written in an identical font in all lowercase letters, except for the "o" in the word "Barrio," which is shaped like a marigold. (*Id.*) Leneghan and Kahn incorporated these elements, as well as others set forth below, into what Plaintiffs define as their trade dress.

### B.      Barrio's Trade Dress

In their Motion for Partial Summary Judgment, Plaintiffs define Barrio's trade dress as follows:

> Barrio is defined by its unique, hip, energetic, and eclectic atmosphere and style of food service. Each Barrio location is decorated with large street style murals painted directly on the walls of the restaurants. The street artist murals feature animated skull and skeleton designs painted on the walls throughout each restaurant. Servers do not wear uniforms but are dressed in street clothes and the Barrio furnishings are simple, unclothed tables and chairs. On each dining table, customers find a table caddy that holds a roll of paper towels in lieu of napkins, a long, narrow pad of paper displaying a scantron-style menu and several pre-sharpened pencils.

> Each Barrio location has an oval sign above the entrance with the Day of the Dead skull and reading as follows:
> barrio<br>tacos + tequila + whiskey

> The menu at Barrio is called a "Chit." It is in the form of a scantron and allows customers to build their own tacos. The menu is divided into 7 sections: Tortillas; Protein; Cheese; Toppings; Salsa; Sauces; and Sides. In each section are relevant fresh taco ingredients for the customer to select. To the right of each ingredient choice are circles that the customer can to [sic] fill in with the provided pencil if he/she wants that ingredient on a taco. A customer can create up to two custom tacos on each menu form. Alternatively, on separate scantron-style menus, customers can select recommended combinations.

> The custom tacos are then served street style as they are wrapped in foil and are served with tortilla chips in rectangular paper food trays and plastic baskets accompanied with a plastic disposal [sic] spork. Guacamole, salsa, and queso, if ordered, are served in black, caldron-style bowls with a basket of tortilla chips, and alcoholic beverages, such as craft brews and specialty margaritas, are served in mason jars.

4

(Doc. No. 137-1, PageID# 3097-98.)

In their Opposition to Condado's Motion for Summary Judgment, Plaintiffs summarize Barrio's trade dress as follows: "[i]n this case, the overall trade dress is the atmospheric 'vibe' in which customers are immersed upon entering Barrio's restaurant which is nonfunctional." (Doc. No. 121, PageID# 2437.)

In their Reply in Support of their Motion for Partial Summary Judgment, Plaintiffs further clarify that "[a] significant aspect of the Plaintiffs' trade dress is the sea of murals covering the Barrio restaurant walls . . . ." (Doc. No. 126, PageID# 2557.) Plaintiffs maintain that Barrio's murals "help create the eclectic, 'busy,' and vibrant atmosphere for which Barrio is known." (*Id.*)

### C. Dissolution of Leneghan's and Kahn's Business Relationship and Subsequent State Court Litigation

Barrio Tremont opened in May 2012. (Doc. No. 114-1, PageID# 1692.) Barrio was an instant success, and by May 2013, Leneghan was already working to open a second Barrio location in Lakewood, Ohio, to be owned and operated by Tres Amigos, LLC. (Doc. No. 137-2, ¶ 31.) At that time, Tres Amigos, LLC had three partners: Leneghan, Kahn, and Sean Fairbairn ("Fairbairn"). (*Id.*)

Despite Barrio Tremont's success, the business relationship between Leneghan and Kahn quickly soured. (Doc. No. 137-1, PageID# 3088; Doc. No. 114-1, PageID# 1693.) In an attempt to gain more control of Justin Hughes, LLC, Kahn approached Thomas DeSantis ("DeSantis") in July 2013 to inquire whether DeSantis would loan Kahn $110,000 so that Kahn could purchase additional shares in Justin Hughes, LLC. (Doc. No. 135-1, PageID# 2748.) While DeSantis declined to loan Kahn the $110,000 that Kahn needed to acquire equal ownership in Justin Hughes, LLC, DeSantis and Kahn discussed creating a build-your-own taco restaurant chain separate from Leneghan and

5

Barrio. (*See, e.g.,* Doc. No. 112-1, PageID# 1259, Kahn Depo. Ex. 8.) Throughout 2013, DeSantis and Kahn discussed via email whether Kahn's Operating Agreement with Justin Hughes, LLC allowed Kahn to open separately from Leneghan another restaurant under the name "Barrio", the feasibility of opening a "Barrio express," in which customers ordered their food in a cafeteria-style line instead of with a chit from a server, and whether it would be better to open a build-your-own taco restaurant in a new market where Barrio did not exist, to avoid any perception that their new restaurant was imitating Barrio's build-your-own taco concept. (*See, e.g.,* Doc. No. 112-1, PageID# 1272-80, Kahn Depo. Exs. 15-18.)

On September 3, 2013, Leneghan removed Kahn from his position of operating partner of Justin Hughes, LLC. (*See* Doc. No. 135-1, PageID# 2744; Doc. No. 136-1, PageID# 2987-88.) Subsequently, Kahn filed a lawsuit in state court. (Doc. No. 112-1, PageID# 1171, Kahn Depo. Ex. 3.) After engaging in litigation for more than a year, the parties resolved their dispute via a Mutual Release and Settlement Agreement (the "RSA") on August 11, 2014. The RSA divested Kahn and Cassyck, LLC of any ownership in Barrio, prohibited them from utilizing the Barrio name, trademarks, service marks, and logos, and prohibited them from using, disclosing, or disseminating Barrio's trade secrets. (Doc. No. 114-9, ¶ 8.) Further, the RSA prohibited any party from disparaging another party to the RSA but allowed Kahn to indicate that he was a co-founder of the Barrio restaurants. (*Id.* at ¶ 9.) Relevant to the instant matter, the RSA provides:

> 8.) <u>NON-COMPETITION.</u> The name "Barrio" is a trade-name registered to Mr. Thomas Leneghan with the office of the Ohio Secretary of State (State of Ohio Entity No. 2220930). The Kahn Parties along with any business entity in which the Kahn Parties have an ownership interest or profit interest, any party in privity with the Kahn Parties and/or any Party acting in concert with the Kahn Parties (hereinafter referenced as the "Restricted Parties"), shall forever be prohibited from owning, conducting or engaging in any business activities under the trade-name of "Barrio" and shall be

prohibited from utilizing any logo, trade mark or service mark associated with "Barrio," including the phrase "In the heart of . . ."

In addition, for a period of two (2) years from the Effective Date the Restricted Parties are further prohibited from owning or operating a Mexican-themed restaurant within a two (2) mile radius of Barrio Gateway, Barrio Lakewood and Barrio Tremont. Nothing set forth herein shall in any way limit the Leneghan Parties [sic] use of the name "Barrio" or otherwise limit the Leneghan Parties [sic] right to open a Mexican-themed restaurant.

9.) <u>NON-DISPARAGEMENT.</u> No Party to this Agreement shall make, publish or disseminate, either directly or indirectly, any defamatory or negative comments, whether true or untrue, about any other Party to this Agreement, the business operations of a Party of this agreement, or any of the Barrio restaurants. If any Party is asked to comment on the former business association and/or the Barrio restaurants, the Parties Parties [sic] shall indicate that by mutual, amicable agreement the parties are no longer associated with one another. The Kahn Parties shall be permitted to indicate that they were co-founders of the Barrio restaurants. Further, the Parties shall not interfere in any way with the ongoing or future business operations or interests of any other Party.. [sic]

(Doc. No. 114-9, ¶¶ 8-9.)

**D.  Creation of Condado Tacos**

In November 2014, a few months after the execution of the RSA, Kahn, along with his new business partners DeSantis and Jonathan Adams ("Adams"), opened a build-your-own taco restaurant called Condado Tacos in the Short North neighborhood of Columbus, Ohio. (Doc. No. 135-1, PageID# 2758.) Painted on one of the walls of Condado's Short North location was a mural that depicted decorative motifs associated with the Day of the Dead, including skeletons. (*Id.* at PageID# 2761.) Like at Barrio, Condado diners build their own tacos by completing a "chit" checklist to indicate what type of custom taco they wish to order. (*Id.* at PageID# 2761.) At one time, Condado also served some of its drinks out of mason jars. (*Id.*) Prior to the COVID-19 pandemic, Condado also utilized wooden table caddies on each table. (*Id.* at PageID# 2762.) Like at Barrio, Condado's caddies held utensils, chit menu packets, and paper towel rolls. (*Id.*)

Plaintiffs quickly learned about Kahn's new business venture. In December 2014, Plaintiffs' attorney, Scott Orille, sent a letter to Defendants' attorney, Bradley Barmen, notifying Barmen that Kahn had violated the RSA's confidentiality provision when Kahn told a reporter that he sold his interest in Barrio and moved to Columbus to join its emerging restaurant scene. (Doc. No. 114-12, PageID# 1860, Ex. J, Defendants' Motion for Summary Judgment.) Orille also took issue with Kahn's references to Barrio in various news stories and claimed that, while Kahn was not conducting business under Barrio's trade name, Kahn was blurring any possible distinction by intertwining Barrio with Kahn's new Condado venture. (*Id.* at PageID# 1861.) Orille concluded by requesting that Kahn "cease and desist from making further disclosures about the nature of the Agreement and from continuing to trade off of the Barrio trade name," lest Barrio take further legal action. (*Id.*)

In March 2015, Leneghan emailed Kahn personally, accusing Kahn of "[t]rying to steal our intellectual properties" and "interfere[ing] in [Barrio's] business . . . ." (Doc. No. 114-13, PageID# 1862, Ex. K, Defendants' Motion for Summary Judgment.) Leneghan asked that Kahn "refrain from contacting any of our purveyors or employees in regards to our brand or barrios [sic] intellectual properties in the future." (*Id.*)

Between 2015 and 2018, Defendants subsequently opened several additional Condado locations throughout southern Ohio, Pennsylvania, and Indiana. (*Id.* at PageID# 1127.) While all Condado locations incorporate a skeleton into the bathroom artwork, the subsequent Condado locations do not feature a Day of the Dead theme, but instead feature colorful, graffiti-like "street art" motifs featuring made-up characters like "Moon Man" and "Taco Man." (*Id.*)

Sometime in early to mid-2018, Defendants announced that they planned to open the first Cleveland-area Condado at Pinecrest, a shopping center in Orange Village, Ohio. (Ex. L, Defendants'

Motion for Summary Judgment, Doc. No. 114-14, PageID# 1863-64; Doc. No. 136-1, PageID# 3018-19.)  In May 2018, Plaintiffs and Defendants began negotiating a possible acquisition of Barrio by Condado.  (*Id.*)  Although the parties engaged in preliminary discussions regarding a possible sale, they did not come to an agreement.  (*Id.*)  Shortly before Defendants opened the Pinecrest Condado, Plaintiffs filed this lawsuit.  (Doc. No. 136-1, PageID# 3019.)

### E.    Procedural History

On September 7, 2018, Plaintiffs filed the instant lawsuit.  (Doc. No. 1.)  Plaintiffs' original Complaint contained nine counts, specifically misappropriation of trade secrets under federal and state law, trade dress infringement and unfair competition under federal law, unfair competition and deceptive trade practices under state law, breach of contract, unjust enrichment, and tortious interference.  (*Id.*)  Plaintiffs also moved for a temporary restraining order and preliminary injunction to enjoin Defendants from opening additional Condado Tacos restaurants, including the Pinecrest location. (Doc. No. 5.)  On November 14, 2018, the prior judge assigned to this case denied Plaintiffs' motion for a temporary restraining order, finding that Plaintiffs failed to demonstrate by clear and convincing evidence a substantial likelihood of success on the merits of their claims.  (Doc. No. 14.)

Since then, Plaintiffs twice amended their Complaint.  (Doc. Nos. 16, 53.)  Plaintiffs' Second Amended Complaint sets forth the following claims: (1) trade dress infringement and unfair competition, in violation of the Lanham Act; (2) breach of contract; (3) misappropriation of trade secrets, in violation of Ohio's Trade Secrets Act; (4) unfair competition and deceptive trade practices, in violation of Ohio's Deceptive Trade Practices Act; (5) unjust enrichment; (6) tortious inference with a business relationship against Defendants Adams and DeSantis; (7) tortious interference with a

contract against Defendants Adams and DeSantis; (8) temporary and permanent injunction; (9) copyright infringement; and (10) fraud and conspiracy to commit fraud. (Doc. No. 53, ¶¶ 58-173.)

In response to Plaintiffs' Second Amended Complaint, Defendants filed their own set of counterclaims on November 11, 2019. (Doc. No. 58.) Defendants alleged the following counterclaims: (1) malicious prosecution; (2) breach of contract; (3) negligent misrepresentation; (4) tortious interference with business relations; and (5) fraud. (*Id.* at ¶¶ 35-75.) On June 30, 2020, the Court dismissed Defendants' malicious prosecution and tortious interference counterclaims. (Doc. No. 77.)

The parties filed their cross-motions on February 26, 2021. (Doc. Nos. 137-1, 114.) Plaintiffs and Defendants each filed oppositions to the others' motions on April 5, 2021, to which each replied on April 29, 2021. (Doc. Nos. 121, 122, 126, 127.) Thus, the parties' motions are now ripe and ready for review.

## II.     Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006). "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law." *Henderson*, 469 F.3d at 487.

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman v. Experian Info. Solutions, Inc.*, 901 F.3d 619, 628 (6th Cir. 2018). In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact." *Ask Chems., LP v. Comput. Packages, Inc.*, 593 F. App'x 506, 508 (6th Cir. 2014). The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 764 (6th Cir. 2008). "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial." *Ask Chems.*, 593 F. App'x at 508-09. "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'" *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F. Supp. 3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

## III.  Analysis

In their Motion for Partial Summary Judgment, Plaintiffs assert that they are entitled to summary judgment on their breach of contract and Lanham Act claims because Defendants copied Barrio's distinctive trade dress, in violation of both the RSA and the Lanham Act. (Doc. No. 137-1, PageID# 3095-3120.) Plaintiffs further assert that each of Defendants' counterclaims must be dismissed because the RSA does not grant Defendants the right to use Barrio's trade dress. (*Id.* at

PageID# 3120-23.)  In their Motion for Summary Judgment, Defendants assert that they are entitled to summary judgment on all of Plaintiffs' claims[3] because Plaintiffs cannot establish that Defendants violated Barrio's trade dress in any way.[4]  (Doc. No. 114-1, PageID# 1699-1726.)  In other words, the central inquiry in resolving these cross-motions is determining whether Defendants infringed on Plaintiffs' putative trade dress.

### A.    Counts 1 and 4: Trade Dress Infringement and Unfair Competition/Unfair Competition and Deceptive Trade Practices

Section 43(a) of the Lanham Act[5] creates a "federal cause of action for infringement of marks and trade dress that have not obtained federal registration."  *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760-61 (6th Cir. 2005); 15 U.S.C. § 1125(a).  Trade dress is the total image of the product, including all of its identifying characteristics such as size, shape, package, and sales techniques, which make it distinguishable from other products in the market.  *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 764 n. 1, (1992); *see also Ferrari S.P.A. Esercizio Fabriche Automibili E Corse v. Roberts*, 944 F.2d 1235, 1238-39 (6th Cir. 1991).  In order to succeed on a claim of trade dress infringement under § 43(a), a plaintiff must prove: "1) that the trade dress in question is distinctive in the marketplace, thereby indicating the source of the good it dresses, 2) that the trade

---

[3] Defendants do not move for summary judgment on their counterclaims.  (Doc. No. 114-1.)

[4] Defendants assert repeatedly throughout their Motion, Opposition, and Reply that this Court is bound, per the law of the case doctrine, by its determination of Plaintiffs' likelihood of success on the merits as set forth in the Court's denial of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction.  (*See, e.g.,* Doc. No. 114-1, PageID# 1700, n.6.)  Defendants are incorrect that the Court is bound by the law of case doctrine as to the merits of Plaintiffs' claims because "[r]ulings that simply deny extraordinary relief for want of a clear and strong showing on the merits, or that are avowedly preliminary or tentative, do not trigger law of the case consequences."  *Schenck v. City of Hudson*, No. 98-3353, 2000 WL 245482, at *2 (6th Cir. 2000).

[5] In Count Four of their Second Amended Complaint, Plaintiffs assert a claim for unfair competition and deceptive trade practices, arising under the Ohio Deceptive Trade Practices Act, Ohio Rev. Code §§ 4165.02, *et seq.*  (Doc. No. 53, ¶¶ 89-95.)  "Ohio Courts look to the Lanham Act when interpreting the Ohio Deceptive Trade Practices Act."  *Collins v. Marva Collins Preparatory Sch.*, No. 1:05-cv-614, 2007 WL 1989828, at *3 n.3 (S.D. Ohio July 9, 2007).  As a result, "the Ohio Deceptive Trade Practices Act claim will not be separately analyzed."  *Id.*

dress is primarily nonfunctional, and 3) that the trade dress of the competing good is confusingly similar." *Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.*, 280 F.3d 619, 629 (6th Cir. 2002). "[A]s all three elements are necessary for a finding of trade dress infringement, any one could be characterized as threshold." *Dippin' Dots, Inc. v. Frosty Bites Dist., LLC*, 369 F.3d 1197, 1202 (11th Cir. 2004) (quoting *Epic Metals Corp. v. Souliere*, 99 F.3d 1034, 1039 (11th Cir. 1996)).

However, "an idea, a concept, or a generalized type of appearance" cannot be protected under trade dress law, although "the concrete expression of an idea in a trade dress has received protection." *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 32-33 (2d Cir. 1995). In other words, a "mere method or style of doing business" is not protectable trade dress. *See Prufrock Ltd. v. Lasater*, 781 F.2d 129, 131-32 (8th Cir. 1986). In *Prufrock*, the district court defined the plaintiff's trade dress as "a full service restaurant, serving down home country cooking, in a relaxed and informal atmosphere, with a full-service bar, and which employs all or any of" eight specifically described décor elements. *Id.* at 131. The Eighth Circuit held that a "franchisor does not have a business interest capable of protection in the mere method and style of doing business." *Id.* at 131-32 (citing *Denton v. Mr. Swiss of Missouri, Inc.*, 564 F.2d 236, 243 (8th Cir. 1977)). The court concluded that to allow the plaintiff "to protect its *country cooking concept* under section 43(a) of the Lanham Act would allow it to appropriate the country cooking concept to the exclusion of all others." *Id.* The *Prufrock* court held that regardless of whether the specifically described décor elements were entitled to trade dress protection, the restaurant's overall theme—informal country dining—could not acquire such trade dress protection. *See also Jeffrey Milstein,* 58 F.3d at 32.

Accordingly, the Court concludes that, to the extent Plaintiffs seek trade dress protection for the Barrio concept or "vibe," such an attempt fails. (*See* Doc. No. 121, PageID# 2437.) The Court is not persuaded by Plaintiffs' assertion that Defendants "intentionally created a 'carbon copy' of Barrio," based on Kahn's deposition testimony that he took the Barrio "concept" to Columbus. (Doc. No. 137-1, PageID# 3103, quoting Doc. No. 135-1, PageID# 2784.) The Court agrees that Defendants clearly implemented the same *concept* at Condado that was already in place at Barrio: a Mexican-themed, build-your-own tacos restaurant. However, the implementation of a concept or style of service is not entitled to trade dress protection. *See Prufrock*, 781 F.2d at 132; *see also Jeffrey Milstein,* 58 F.3d at 32. Thus, Kahn's testimony that he implemented Barrio's build-your-own taco *concept* at Condado is not evidence of intentional copying of protectable trade dress. (*See* Doc. 135-1, PageID# 2780.)

Further, Plaintiffs' reliance on *Two Pesos, Inc. v. Taco Cabana, Inc.* to support their assertion that Barrio's "vibe" is entitled to trade dress protection is misplaced. (*See* Doc. No. 121, PageID# 2433, 2440; Doc. No. 126, PageID# 2545.) Plaintiffs contend that this case is "indistinguishable" from *Two Pesos*. (*Id.* at PageID# 2440; *see also* Doc. No. 126, PageID# 2545.) The Court disagrees. The issue in *Two Pesos* was whether a restaurant's trade dress may be protected under the Lanham Act based on a finding of inherent distinctiveness alone, without proof that the restaurant's trade dress also has secondary meaning. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 764-65 (1992). The Supreme Court explicitly did *not* consider whether Taco Cabana's trade dress was inherently distinctive, descriptive, or functional:

> The Court of Appeals determined that the District Court's instructions were consistent with the foregoing principles and that the evidence supported the jury's verdict. Both courts thus ruled that Taco Cabana's trade dress was not descriptive but rather inherently distinctive, and that it was not functional. **None of these rulings is before**

14

**us in this case, and for present purposes we assume, without deciding, that each of them is correct.** In going on to affirm the judgment for respondent, the Court of Appeals, following its prior decision in *Chevron,* held that Taco Cabana's inherently distinctive trade dress was entitled to protection despite the lack of proof of secondary meaning. **It is this issue that is before us for decision**, and we agree with its resolution by the Court of Appeals.

*Id.* at 770.

Plaintiffs assert that "[t]he *Supreme Court described* Taco Cabana['s] trade dress as follows: [A] *festive eating atmosphere* having interior dining and patio areas decorated with artifacts, bright colors, paintings and murals. . . . ." (Doc. No. 121, PageID# 2433, emphasis added.) Plaintiffs misattribute the description of Taco Cabana's festive eating atmosphere to the Supreme Court. Rather, at the outset of the recitation of facts, Justice White wrote the following:

> Respondent Taco Cabana, Inc., operates a chain of fast-food restaurants in Texas. The restaurants serve Mexican food. The first Taco Cabana restaurant was opened in San Antonio in September 1978, and five more restaurants had been opened in San Antonio by 1985. **Taco Cabana describes its Mexican trade dress as**
>
>> "**a festive eating atmosphere** having interior dining and patio areas decorated with artifacts, bright colors, paintings and murals. The patio includes interior and exterior areas with the interior patio capable of being sealed off from the outside patio by overhead garage doors. The stepped exterior of the building is a festive and vivid color scheme using top border paint and neon stripes. Bright awnings and umbrellas continue the theme." 932 F.2d 1113, 1117 (CA5 1991).

*Id.* at 765. The Supreme Court did not hold that Taco Cabana's trade dress was a "festive eating atmosphere." *Id.* Rather, the Supreme Court assumed without deciding that the district court correctly instructed the jury as to distinctiveness, that there was sufficient evidence to support the jury's verdict, and that the Fifth Circuit Court of Appeals was correct in upholding the jury's verdict in favor of Taco Cabana. *Id.* at 770. Thus, *Two Pesos* does not support Plaintiffs' assertion that their abstract "vibe" is protectable trade dress.

Additionally, the Fifth Circuit's opinion in the underlying appellate matter, *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, does not support Plaintiffs' argument that their "vibe" is protectable trade dress. The Fifth Circuit concluded that "Taco Cabana can protect a combination of visual elements that, taken together . . . may create a distinctive *visual* impression." *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1118 (5th Cir. 1991), *aff'd*, 505 U.S. 763 (1992). (internal quotations omitted) (emphasis added). According to the Fifth Circuit, "Two Pesos may enter the upscale Mexican fast-food market, *but it may not copy Taco Cabana's distinctive combination of layout and design features.*" *Id.* (emphasis added). Thus, the Fifth Circuit affirmed that the jury was correct to examine whether Taco Cabana's *visual* elements, including layout, design features, and décor, combined to create a distinctive trade dress, not whether Taco Cabana's "atmosphere" or vibe was fun, exciting, or engaging. *Id.* According to the Fifth Circuit, the jury considered "ample evidence" related to the distinctiveness of Taco Cabana's trade dress, including site visits to the competing restaurants, as well as hearing testimony from two individuals who "replicate[d]" the "look" of Taco Cabana's restaurants at Two Pesos's restaurants. *Id.* at 1120-21. In other words, the jury considered substantial evidence related to the *visual* elements of Taco Cabana's trade dress, not its abstract vibe or atmosphere. *Id.*

Moreover, Plaintiffs do not explain how Barrio's "unique, hip, energetic, and eclectic atmosphere" is distinct from that of any other restaurant. (Doc. No. 137-1, PageID# 3097.) Indeed, Leneghan and Kahn drew inspiration for Barrio's atmosphere from the cool "vibes" at Mexican restaurants like Momocho and Mad Mex. (Doc. No. 136-1, PageID# 2995-96.) No doubt Momocho, Mad Mex, and the other restaurants from which Leneghan and Kahn drew inspiration—including Happy Dog and the Barrio chain in Minneapolis (with which Plaintiffs' Barrio restaurants share a

nearly identical logo)—endeavor to establish equally vibrant, hip atmospheres. The Lanham Act is intended to protect "the concrete expression of an idea," not abstract ideas, concepts, or styles of doing business. *Best Cellars Inc. v. Grape Finds at Dupont, Inc.*, 90 F.Supp.2d 431, 451 (S.D.N.Y. 2000) (quoting *Jeffrey Milstein*, 58 F.3d at 32-33 (noting that "[t]his can be a difficult distinction to draw, and in doing so, 'a helpful consideration will be the purpose of trade dress law: to protect an owner of a dress in informing the public of the source of its products, without permitting the owner to exclude competition from functionally similar products.'"))

Therefore, to the extent that Plaintiffs attempt to seek trade dress protection for Barrio's build-your-own taco concept and "vibe," the Court concludes that Barrio's build-your-own taco concept and "vibe" are not entitled to trade dress protection. The Court will proceed to examine whether Plaintiffs' visual elements (including their large Day of the Dead-themed wall murals, servers in street clothes, table caddies that holds paper towels in lieu of napkins, drinks served in mason jars, narrow pads of paper containing "chit" menus, and pre-sharpened pencils), when taken together, comprise protected trade dress. *Happy's Pizza*, 2013 WL 308728, at *3.

## 1.    Distinctiveness

"The first step in qualifying trade dress for protection under § 43(a) is proving distinctiveness." *Abercrombie*, 280 F.3d at 635. "[C]ourts have universally imposed th[is] requirement, since without distinctiveness the trade dress would not 'cause confusion . . . as to the origin, sponsorship, or approval of [the] goods,' as [Section 43(a)] requires." *Id.* (quoting *Wal-Mart Stores, Inc. v. Samara Bros. Inc.*, 529 U.S. 205, 210 (2000)). "Distinctiveness of trade dress may be inherent or demonstrated by secondary meaning." *Happy's Pizza*, 2013 WL 308728, at *3 (citing *Abercrombie*, 280 F.3d. at 635). Trade dress is inherently distinctive when its "intrinsic nature serves

to identify a particular source." *Id.* It acquires secondary meaning when, "'in the minds of the public, the primary significance of a [trade dress] is to identify the source of the product rather than the product itself.'" *Id.* (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n. 11 (1982)). In *Abercrombie*, the Sixth Circuit adopted the categories of distinctiveness set forth by the Second Circuit. *Abercrombie*, 280 F.3d. at 635 (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 10-11 (2d Cir. 1976)). Among these categories, those marks found to be "arbitrary ('Lucky Strike cigarettes'), fanciful ('Kodak' film), or suggestive ('Tide' laundry detergent)" are inherently distinctive. *Id.* Marks that are merely descriptive or generic are not inherently distinctive. *Id.* at 636. "Although descriptive trade dress receives protection if it acquires secondary meaning, generic trade dress cannot." *Happy's Pizza*, 2013 WL 308728, at *3 (citing *Abercrombie*, 280 F.3d. at 636).

In this case, Plaintiffs assert that they "created and deployed in [their] restaurants a combination of visual elements which, when taken together, is distinctive." (Doc. No. 137-1, PageID# 3097.) The "interior décor category fits awkwardly into the classifications of trade dress law, constituting either product packaging or a 'tertium quid' akin to product packaging." *Best Cellars, Inc. v. Wine Made Simple, Inc.*, 320 F.Supp.2d 60, 70 (S.D.N.Y.2003) (citing *Samara Bros., Inc.*, 529 U.S. at 215). Both the *Best Cellars* and *Happy's Pizza* courts determined that the Second Circuit's *Abercrombie & Fitch* test applied to trade dress claims arising out of restaurant decor infringement.

A restaurant's trade dress is not distinctive when it incorporates "prototypical features" found generally in restaurants. *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 702 F.3d 1312, 1323-24 (11th Cir. 2012). In *Miller's Ale House, Inc.*, because the plaintiff-appellant did not contest the district court's conclusion that it failed to raise a genuine issue of material fact as to

18

whether its trade dress had acquired secondary meaning, the Eleventh Circuit limited its inquiry "to the question of whether Miller's trade dress is inherently distinctive." *Id.* at 1322-23. The Eleventh Circuit concluded that the plaintiff-appellant "failed to raise a genuine question of material fact as to the essential element of distinctiveness," and therefore, its restaurant interiors could not be protectable trade dress. *Id.* The court rejected the plaintiff-appellant's argument that the overall "'composite commercial impression' created by its 'interior and layout, the prominent use of the ALE HOUSE logos throughout the restaurants, menu design and placement, method of service, and uniforms is unique and distinctive' and thus entitled to protection as trade dress." *Id.* The court found "nothing particularly unique in a restaurant fixing its name in red letters on the outside of its building and on its menu, branding items it sells with that name, dressing its staff in khakis and a polo shirt, featuring a center bar with a soffit, offering seating at 'high-top' tables, and paneling its walls with wood." *Id.* at 1324. Rather, according to the Eleventh Circuit, these visual elements are "the prototypical features—what we might call the 'common . . . design,'. . .—of a standard sports bar or brew pub." *Id.* (quoting *Brooks Shoe Mfg. Co., Inc. v. Suave Show Corp.*, 716 F.2d 854, 858). The court concluded that it could not "find that 'the design, shape or combination of elements is so unique, unusual or unexpected in this market that [we] can assume without proof that it will automatically be perceived by customers as an indicator of origin—a trademark." *Id.* (quoting 1 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 8:13 (4th ed. 2012)).

Relatedly, a restaurant's trade dress is not inherently distinctive based on the restaurant's "arbitrary use of each element constituting the décor." *Happy's Pizza Franchise, LLC v. Papa's Pizza, Inc.*, No. 10-15174, 2013 WL 308728, at *4 (E.D. Mich. Jan. 25, 2013). In *Happy's Pizza*, the court drew a "distinction between arbitrarily selecting design elements that result in a unique and

distinctive trade dress and arbitrarily selecting elements that result in nothing more than a generic design," and concluded that the plaintiff's trade dress was generic. *Id.* The court rejected the plaintiff's argument that its restaurants' trade dress was inherently distinctive because each element (*e.g.*, an "expansive menu, granite countertops, black industrial style rugs, back-lit signage, neon signage, steel shelving, stacked pizza boxes, and ceramic tiled floors and walls") was arbitrarily chosen. *Id.* The court concluded that the plaintiff failed to provide evidence that, among other things, "other fast food restaurants do not use these elements," "that other restaurants do not offer similar food combinations," and also that all of the defendant's competing restaurants use the plaintiff's elements. *Id.* Further, the court observed that the plaintiff's menu items "are described generically, i.e., 'Perch and Shrimp Combo,'" and that the plaintiff was "certainly not the first fast food restaurant to offer such menu items." *Id.*

Additionally, when determining whether the trade dress is distinctive, "[t]he proper focus is on the overall appearance of the restaurants, rather than just the similarities." *HI Ltd. Partnership v. Winghouse of Florida*, 347 F.Supp.2d 1256, 1259 (M.D. Fla. 2004). In *HI Ltd.*, the court concluded that the "only component of Plaintiffs' trade dress that is either distinctive or has achieved secondary meaning is the Hooters Girl." *Id.* However, "[t]he remaining elements of Hooters' trade dress consist of fairly generic items"—including wall décor such as surfboards, hula hoops, large-bulb Christmas lights, photos of celebrities with Hooters Girls, bumper stickers, and kitschy road signs, and food service items like vertical paper towel spools on each table and wood-weave baskets—which are "commonly found in sports bar and grills, beach-themed restaurants, and raw bars." *Id.* at 1258-59. When the court compared the overall appearance of the plaintiff's and defendant's competing restaurants, the court concluded that the "differences between the two restaurants overwhelmingly

predominate over their similarities; the differences are simply too significant to present a jury question of infringement." *Id.* at 1259. Differences included the restaurant names, "the restaurant exterior, the absence of orange, the full bar, the gaming area, the absence of a 'beachy' theme, and the focus on former professional football player Crawford Ker himself." *Id.* Further, the court concluded that the similarities between the two restaurants, including "wood weave plates, vertical paper towel spools, wooden tables, table tents, wood interior, sports memorabilia and pictures affixed to walls, a menu that describes the restaurant on its reverse side, and even artifacts displayed in the Winghouses (e.g., surfboards), are far too typical of other restaurants, particularly the sports bar and grill genre, to provide any basis for a finding of infringement." *Id.*

For the following reasons, the Court concludes that Plaintiffs' purported trade dress is not inherently distinctive. First, when the Court examines the overall appearance of Plaintiffs' restaurants, the Court concludes that nearly all the elements that comprise Barrio's alleged trade dress "are far too typical of other restaurants," particularly restaurants in the trendy casual and Mexican genres. *HI Ltd.*, 347 F.Supp.2d at 1259. Uncovered tables, paper towel spools, mason jars, sporks, foil-wrapped food, and paper trays are generic and not unique to Plaintiffs' restaurants. *See id.*; *see also Happy's Pizza*, 2013 WL 308728, at *4; *Miller's Ale House, Inc.*, 702 F.3d at 1324. Additionally, Barrio's menu is divided into seven sections, including "Tortilla," "Protein," "Cheese," "Toppings," "Salsa," "Sauces," and "Sides." (Doc. No. 53, ¶ 29; Doc. No. 137-8, PageID# 3230.) These menu items are described generically, and Plaintiffs are "certainly not the first" taco restaurant "to offer such items." *Happy's Pizza*, 2013 WL 308728, *4. Plaintiffs' arbitrary decision to combine these generic elements does not suddenly render them inherently distinctive. *Id*.

Second, there is ample evidence that several elements of Barrio's purported trade dress were imported directly from other restaurants. Both Leneghan and Kahn agree that Barrio's paper "chit" menu and pre-sharpened pencils are taken from another popular Cleveland restaurant, Happy Dog. (Doc. No. 135-1, PageID# 2762; Doc. No. 136-1, PageID# 2992.) Additionally, while Plaintiffs argue that Condado's sign is a "copycat" of Barrio's sign,[6] Plaintiffs ignore the fact that Barrio's logo is nearly *identical* to that of another Barrio restaurant based in Minnesota. *Compare* Barrio, https://barriotequila.com (last visited June 25, 2021) *with* Barrio Tacos, https://barrio-tacos.com (last visited June 25, 2021). Further, even Barrio's name (which is Spanish for "neighborhood") is not distinct, as Barrio shares its name with more than ten other restaurants across the country also called "Barrio," or some variation thereof. (*See* Doc. No. 114-1, PageID# 1705, n.9.) Thus, examining Plaintiffs' purported trade dress as a whole, the Court concludes that Plaintiffs' putative trade dress is not inherently distinctive, but comprised of mostly generic design elements commonly found in restaurants, particularly taco and Mexican restaurants. *Id.*

Plaintiffs rely heavily on the black and white Day of the Dead-themed murals painted throughout their restaurants to attempt to establish that their purported trade dress is distinct. (Doc.

---

[6] There is ample evidence that Condado's logo and exterior signage are significantly different than that of Barrio's. (*See* Doc. No. 114-2, PageID# 1735.) Certain Condado exterior signage is done in either white, electronically illuminated block letters, or via a vertical sign with red block letters. (*Id.*) Conversely, Barrio's exterior signage is oval-shaped and features the name Barrio in a serif gothic font. Even the two logos that Barrio presents in its Motion are largely different from one another. (*See* Doc. No. 137-1, PageID# 3099.) The primary similarity between the two logos is that they are both oval-shaped. (*Id.*) However, Barrio's sign features a solid background, the word "Barrio" written in an all-lowercase gothic serif font, the "o" in "Barrio" is in the shape of a marigold, and the words "tacos + tequila + whiskey" are written below "Barrio" in small sans serif font. On the other hand, the background of Condado's sign is white and covered in decorative black scrollwork and features a skull with a sombrero and an oversized mustache. (*Id.*) The word "Condado" is written in an all-uppercase sleek sans serif font. (*Id.*) The words "Tacos Tequila Margaritas" are written underneath in the same uppercase font as "Condado." (*Id.*) Another of Plaintiffs' exhibits reveals yet another Condado logo at the top of Condado's chit menu. (Doc. No. 137-8, PageID# 3230.) This other Condado logo is triangle-shaped, not oval-shaped, and includes the same sleek sans serif font and decorative scrollwork and skull found in Condado's oval-shaped logo. (*Id.*) The logo at the top of Barrio's chit menu, on the other hand, is identical to the oval-shaped logo with black background identified in Plaintiffs' Motion. (*Id.*)

No. 137-1, PageID# 3097.)  However, the presence of Plaintiffs' murals and Plaintiffs' incorporation of the Day of the Dead do not render Plaintiffs' alleged trade dress distinct.  First, as discussed *supra*, when examining Plaintiffs' overall putative trade dress, nearly all of Plaintiffs' trade dress elements are generic, other than the murals.  Second, Condado's murals are brightly colored and feature cartoonish, psychedelic imagery and characters different from that found in Barrio's murals.  (*See* Interior Design Comparison Photographs, Doc. No. 114-2; *see also* McNamara Dep., Doc. No. 114-7, PageID# 1811, likening Condado's Crocker Park artwork to that of the "SpongeBob" cartoon.)  In other words, Plaintiffs' black and white Day of the Dead murals—which are the only individual element of Plaintiffs' putative trade dress that are not generic—look *nothing* like Defendants' psychedelic, brightly colored murals.  Third, to the extent that Condado's Short North location incorporated, or still incorporates skeletons and skulls in its artwork, Leneghan admitted in his deposition that Day of the Dead motifs and skeleton artwork are not uncommon to Mexican restaurants.[7]  (Doc. No. 136-1, PageID# 3003.)  Fourth, Plaintiffs rely too heavily on their Day of the Dead décor as a unique identifier of their trade dress.  The Day of the Dead is simply not unique to Barrio restaurants.  The Day of the Dead is a holiday with significant cultural and religious import that traces its origins back to indigenous, as well as Catholic, traditions throughout Latin America. *See Dia de los Muertos*, National Geographic, https://www.nationalgeographic.org/media/dia-de-los-muertos/ (last visited June 25, 2021).  Celebrants have incorporated images of skeletons and skulls into their Day of the Dead celebrations for hundreds of years.  *Id.*  Plaintiffs have incorporated

---

[7] The use of Day of the Dead images and motifs in *wall murals* is not unusual in Mexican restaurants.  In the Court's review of the other Barrio restaurants that were identified by Defendants in their Motion, the Court observed that at least two other Barrio restaurants, Barrio in Plymouth, Michigan, and El Barrio in Birmingham, Alabama (neither of which appear to be affiliated with Plaintiffs' Barrio restaurants), have decorated their walls with large painted murals that include Day of the Dead motifs and skeletons.  *See* Barrio Cocina y Tequileria, https://www.barrioplymouth.com/ (last visited June 25, 2021); El Barrio Restaurante y Bar, http://elbarriobirmingham.com/ (last visited June 25, 2021).

centuries-old images and motifs into their restaurant décor as a shorthand for Mexican "style." (*See* Doc. No. 53, ¶ 27.) In this regard, there is little difference between Plaintiffs' use of Day of the Dead motifs to connote a Mexican theme in their restaurants and the *HI Ltd.* plaintiff's use of hula hoops and surfboards to connote a beach theme in their restaurants.[8] *See HI Ltd.*, 347 F.Supp.2d at 1259.

When viewed as a whole, Plaintiffs' purported trade dress is overwhelmingly comprised of generic elements. Generic trade dress cannot acquire secondary meaning. *Abercrombie & Fitch*, 280 F.3d at 638. Therefore, the Court need not address whether Plaintiffs' purported trade dress has acquired secondary meaning. Plaintiffs' combination of elements is not so "unique, unusual, or unexpected" in a Mexican restaurant that the Court "can assume without proof that it will automatically be perceived by customers as an indicator of origin—a trademark." *Miller's Ale House*, 702 F.3d at 1324 (quoting 1 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 8:13 (4th ed. 2012)). Because Plaintiffs fail to raise a genuine issue of material fact as to the essential element of distinctiveness,[9] *see Dippin' Dots*, 369 F.3d at 1202, the Court concludes that Plaintiffs' purported trade dress does not qualify for protection under § 43(a) of the Lanham Act and, thus, Plaintiffs cannot establish infringement of their purported trade dress as a matter of law. For

---

[8] Plaintiffs also attempt to establish that their purported trade dress is inherently distinctive based on their expert witness's survey and report. (Doc. No. 137-1, PageID# 3102, "In her Distinctiveness Report Mrs. Cunningham states that 'one can safely conclude that the Barrio trade dress is inherently distinctive.'") However, consumer surveys are a factor that can be used to determine whether trade dress has acquired secondary meaning, not whether the trade dress is inherently distinctive.

[9] In their Opposition, Defendants argue that Plaintiffs impermissibly rely on Leneghan's affidavit (Doc. No. 137-2) and a handful of unsworn Yelp reviews (Doc. No. 137-7) in support of their arguments throughout their Motion, particularly with respect to the issue of likelihood of customer confusion. (Doc. No. 122, PageID# 2462-67.) These exhibits are of no moment because Plaintiffs fail to establish that their purported trade dress is distinctive. The Court need not consider whether Plaintiffs can establish the other two requisites for protectable trade dress—i.e., non-functionality and likelihood of confusion—because any one of these three "could be characterized as threshold." *Dippin' Dots,* 369 F.3d at 1202; *see also Abercrombie*, 280 F.3d at 635.

these same reasons, the Court concludes that Plaintiffs' Ohio Deceptive Trade Practices Act claim also fails.

### 2. Whether Plaintiffs' Trade Dress Infringement Claim Under the Lanham Act is Barred by Laches

Defendants argue that Plaintiffs' trade dress infringement claim not only substantively fails but is also time-barred according to the doctrine of laches. (Doc. No. 114-1, PageID# 1713.) Plaintiffs argue that Defendants willfully infringed on Barrio's trade dress and therefore comes to the court with "unclean hands" and may not claim the equitable defense of laches. (Doc. No. 137-1, PageID# 3115.)

With respect to "Lanham Act and Deceptive Trade Practices Act claims, because there are no specific statutes of limitations, courts apply the equitable doctrine of laches." *Prakash v. Altadis U.S.A. Inc.*, No. 5:10-cv-0033, 2012 WL 1109918, at *20 (N.D. Ohio Mar. 30, 2012). "Ordinarily, a party asserting laches must show '(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it.'" *Kehoe Component Sales Inc. v. Best Lighting Products, Inc.*, 796 F.3d 576, 584 (6th Cir. 2015) (quoting *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 408 (6th Cir. 2002)). In the Lanham Act context, if the plaintiff files its claim "within the time that it would have been required to file in the forum state a state-law claim for injury to personal property, then the plaintiff's delay in asserting its rights is presumptively reasonable." *Id.* However, "a delay beyond the analogous limitations period 'is presumptively prejudicial and unreasonable.'" *Id.* at 584-85 (quoting *Nartron*, 305 F.3d at 408.) The analogous limitations period in Ohio is the two-year statute of limitations provided for in Ohio Revised Code § 2305.10(A). *Id.* at 585. In addition, this period begins to run "when the plaintiff has 'actual or constructive knowledge of the alleged infringing activity.'" *Id.* at 584 (quoting *Nartron*, 305 F.3d at 408).

"While laches is analogous to statute of limitations, laches is equitable relief and subject to the rules of equity." *Am. Air Filter Co., Inc. v. Universal Air Products, L.L.C.*, No. 3:14-cv-665-TBR, 2015 WL 1541937, at *4 (W.D. Ky. Apr. 7, 2015) (citing *Galliher v. Cadwell*, 145 U.S. 368, 373 (1892)). As an equitable defense, laches may "certainly be raised only by one who comes into equity with clean hands." *Id.* (quoting *United States v. Weintraub*, 613 F.2d 612, 619 (6th Cir. 1979)). Accordingly, "a person who deliberately infringes upon another person's intellectual property has unclean hands and may not claim the equitable defense of laches." *Id.* For example, the Sixth Circuit has held that laches was not available to a defendant if its patent infringement "was the result of deliberate, calculated plagiarism." *TWM Mfg. Co., Inc. v. Dura Corp.*, 592 F.2d 346, 349 (6th Cir. 1979). In addition, numerous district courts in the Sixth Circuit have held that the defendant's intentional infringement precluded the defendant from relying on a laches defense. *Am. Air Filter*, 2015 WL 1541937, at *4 ("[V]iewing the facts in the light most favorable to American Filter, Universal Air was aware of the rights of American Filter and acted egregiously by purposefully infringing upon those rights. Arguably, Universal Air has unclean hands and may not raise the equitable defense of laches."); *Days Inn Worldwide, Inc. v. Adrian Motel Co., LLC*, No. 07-13523, 2009 WL 3199882, at *13 (E.D. Mich. Sept. 30, 2009) (rejecting laches defense when defendants "intentionally and willfully infringed on the Days Inn Marks for four years").

Plaintiffs' trade dress is not protected under the Lanham Act because Plaintiffs cannot establish that their trade dress is distinct. Because Plaintiffs' trade dress is not protected, Defendants could not have deliberately infringed on Plaintiffs' trade dress in contravention of the Lanham Act. Accordingly, Defendants may raise the equitable defense of laches. *Cf. Am. Air Filter Co., Inc.*, 2015 WL 1541937, at *4.

On December 18, 2014 Plaintiffs' attorney wrote to Defendants' attorney, outlining certain conduct on Kahn's part that Plaintiffs believed violated the August 2014 RSA, including "trad[ing] off of the Barrio trade name" and "blur[ring] any possible distinction" between Barrio and Condado. (Doc. No. 114-12, PageID# 1860-61.) On March 15, 2015, Leneghan emailed Kahn directly, warning Kahn not to steal Plaintiffs' intellectual properties or interfere with their business. (Doc. No. 114-13, PageID# 1862.) Plaintiffs did not file their trade dress infringement claim until September 2018, shortly before Defendants' first Cleveland-area location opened. (Doc. No. 136-1, PageID# 3021.) Plaintiffs do not dispute that their attorney sent a letter to Defendants attorney in December 2014, that Leneghan emailed Kahn in March 2015, or that Plaintiffs waited to file a lawsuit against Defendants until 2018, when Defendants attempted to enter the Cleveland market.

The Court concludes that Plaintiffs had actual or constructive knowledge of Defendants' alleged infringing activity no later than March 15, 2015, when Leneghan warned Kahn not to steal Plaintiffs' intellectual properties. (*See* Doc. No. 114-13.) Plaintiffs did not file their trade dress infringement claim until September 7, 2018, which is more than three years after Plaintiffs gained actual or constructive knowledge, and well past Ohio's analogous limitations period of two years. *See Kehoe Component Sales Inc.*, 796 F.3d at 585. The Court concludes that Plaintiffs' Lanham Act claim not only fails on the merits but is also time-barred by the defense of laches.

Accordingly, Defendants' Motion for Summary Judgment is granted with respect to Plaintiffs' Lanham Act claim, as well as with respect to Plaintiffs' Ohio Deceptive Trade Practices Act claim.

**B.      Count 2: Breach of Contract**

In their Motion, Plaintiffs assert that Defendants breached the RSA when Defendants allegedly used Barrio's purported trade dress throughout Condado, despite Kahn agreeing in the RSA to refrain from using any "logo, trademark or service mark associated with Barrio."  (Doc. No. 137-1, PageID# 3096, 3099.)  In their Motion, Defendants assert that Plaintiffs' breach of contract claim fails as a matter of law because Plaintiffs' trade dress is not entitled to protection under the Lanham Act and is therefore not a trademark under the RSA.  (Doc. No. 114-1, PageID# 1715-16.)  Defendants argue that, for the reasons discussed with respect to Plaintiffs' trade dress infringement claim *supra*, they are entitled to summary judgment in their favor.  (*Id.*)

Generally, in Ohio, to prove a breach of contract claim, a plaintiff must demonstrate that: "(1) a contract existed, (2) the plaintiff fulfilled his obligations, (3) the defendant failed to fulfill his obligations, and (4) damages resulted from this failure."  *Second Calvary Church of God in Christ v. Chomet*, No. 07CA009186, 2008 WL 834434, at *2 (Ohio Ct. App. 9th Dist. Mar. 31, 2008).  The Court agrees with Defendants that Plaintiffs' breach of contract claim fails as a matter of law.  The RSA precludes Defendants from using the "Barrio" trade name, using "any logo, trade mark, or service mark associated with 'Barrio,' including the phrase 'In the heart of," and/or owning and/or operating, for a period of two years from the date of the RSA, a Mexican-themed restaurant within a two-mile radius of Barrio's downtown Cleveland, Lakewood, and/or Tremont locations.  (Doc. No. 114-9, ¶ 8.)  Plaintiffs assert only that Defendants wrongfully utilized Barrio's trademark by infringing upon its trade dress.  However, as discussed in Section III.A. above, Plaintiffs' trade dress is not entitled to protection as a trademark under the Lanham Act.  *See supra*.  Plaintiffs do not assert that Defendants violated any other RSA provision.  Moreover, the RSA is unambiguous that Kahn is

permitted to indicate that he was a co-founder of the Barrio restaurants. (Doc. No. 114-9, ¶ 9.) Therefore, Plaintiffs' breach of contract claim fails as a matter of law.

### C.      Count 5: Unjust Enrichment

In their Motion, Defendants assert that Plaintiffs' unjust enrichment claim is barred as a matter of law because the subject matter of the instant dispute is governed by the RSA, a valid contract. (Doc. No. 114-1, PageID# 1719.) Plaintiffs argue that they may plead their unjust enrichment theory in the alternative to their breach of contract claim. (Doc. No. 121, PageID# 2449-50.) For the following reasons, the Court concludes Defendants are entitled to summary judgment as to Plaintiffs' unjust enrichment claim.

As this Court recently set forth in *Goodwin, et al. v. American Marine Express, Inc., et al.*:

> "[I]n the absence of fraud or bad faith, Ohio law prohibits recovery under a theory of unjust enrichment where an express contract covers the same subject." *R.J. Wildner Contracting Co., Inc. v. Ohio Turnpike Comm'n*, 913 F. Supp. 1031, 1043 (N.D. Ohio 1996); *accord Champion Contracting Const. Co. Inc. v. Valley City Post*, No. 03CA0092–M, 2004 WL 1459298, at *6 (Ohio Ct. App. 9th Dist. June 30, 2004) ("The doctrine of unjust enrichment, however, is 'inapplicable if an express agreement existed concerning the services for which compensation is sought; the parameters of the agreement limit the parties' recovery in the absence of bad faith, fraud or illegality.'") (quoting *Pawlus v. Bartrug*, 673 N.E.2d 188, 191 (Ohio Ct. App. 9th Dist. 1996)).

> Although the existence of an express contract that governs the same subject matter bars an unjust enrichment claim, "where the existence of a contract is in dispute, [an] unjust enrichment claim may be pled in the alternative to a breach of contract claim." *Right-Now Recycling, Inc. v. Ford Motor Credit Co.*, No. 1:11-cv-364, 2014 U.S. Dist. LEXIS 182828, at *61 (S.D. Ohio Oct. 1, 2014). However, if the existence of the contract is not in dispute, courts routinely dismiss unjust enrichment claims as precluded by the contract. *See, e.g., Pinkerton v. Gov't Employees Ins. Co.*, No. 5:18-CV-1371, 2019 WL 1026227, at *7 (N.D. Ohio Mar. 4, 2019) ("In this case, no party disputes the existence of the underlying insurance contract governing the issues in this case. Because there is no question that an express written contract exists between Pinkerton and defendants covering the disputed UIM coverage, Ohio law precludes a claim for unjust enrichment."); *N. Cent. Elec. Coop., Inc. v. Linde, LLC*, No. 3:16-CV-1890, 2019 WL 460485, at *4 (N.D. Ohio Feb. 6, 2019) ("Because the parties do

not dispute the existence of a contract, but only whether that contract was breached, North Central's unjust enrichment claim may not proceed."); *Amarado Oil Co. v. Davis*, No. 5:12CV627, 2013 WL 5234440, at *12 (N.D. Ohio Sept. 17, 2013) ("In sum, because Amarado agrees that a contract exists and has not pleaded a viable fraud in the inducement claim, Count 3 is dismissed.").

*Goodwin v. Am. Marine Express, Inc.*, No. 1:18-CV-01014, 2021 WL 848948, at *21-22 (N.D. Ohio Mar. 5, 2021).

This case has progressed far past the pleadings stage, and Plaintiffs do not dispute that they entered into an express contract, the RSA, with Defendants that governs the dispute at issue, namely whether Defendants wrongfully infringed upon Plaintiffs' trade dress in contravention of the RSA. Thus, Plaintiffs' unjust enrichment claim is barred by the existence of the RSA. Accordingly, Defendants' Motion for Summary Judgment is granted with respect to Plaintiffs' unjust enrichment claim.

### D. Count 10: Fraud and Conspiracy to Commit Fraud

In their Motion, Defendants assert that Plaintiffs' claim of fraud and conspiracy to commit fraud fails as a matter of law because Defendants did not breach the RSA when they opened Condado. (Doc. No. 114-1, PageID# 1724-25.) Plaintiffs argue that there is ample evidence that Defendants planned to breach the RSA's terms before the RSA was ever finalized. (Doc. No. 121, PageID# 2444-45.) For the following reasons, the Court concludes Defendants are entitled to summary judgment as to Plaintiffs' fraud and conspiracy to commit fraud claim.

In Ohio, "[t]he elements of an action in actual fraud are: (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying

30

upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance." *Gaines v. Preterm-Cleveland, Inc.*, 33 Ohio St.3d 54, 55 (1987).

First, as discussed in Section III.A., the Court concludes that Plaintiffs' putative trade dress is not eligible for trademark protection under § 43(a) of the Lanham Act. *See supra*. Second, as discussed in Section III.B., the Court concludes that Defendants did not breach the RSA. *See supra*. Accordingly, the Court concludes that Plaintiffs cannot establish the requisite elements of their fraud claim as a matter of law.

The RSA's terms are plain. Defendants agreed not to open another Mexican-themed restaurant within a two-mile radius of Barrio's downtown Cleveland, Lakewood, and Tremont locations for two years from the date of the RSA. (Doc. No. 114-9, ¶ 8.) Moreover, Defendants agreed not to utilize the name "Barrio," Barrio's slogan "In the heart of . . .," or Barrio's trademarks. (*Id.*) Defendants opened a Mexican-themed restaurant in Columbus, Ohio—well beyond the two-mile radius set out in the RSA—a few months after the RSA's effective date. Defendants named their restaurant "Condado," did not use the slogan "In the heart of . . .," and did not use any protectable Barrio trade dress.

The Court is not persuaded by Plaintiffs' reliance on the 2013 email exchanges between Kahn and DeSantis. (*See* Doc. No. 121, PageID# 2445-46.) These email exchanges demonstrate only that Kahn attempted to trademark the Barrio name at some point in 2013 and believed, as of August 2013, that he could open Barrio restaurants on his own and without Leneghan's involvement. (*Id.*) As events unfolded, Kahn never trademarked the Barrio name and never opened a restaurant called "Barrio." Had Kahn opened a restaurant named "Barrio" after August 2014, he would have violated

the RSA terms, which expressly forbade him from owning and/or operating a restaurant named "Barrio." (Doc. No. 114-9, ¶ 8.)

Nor is the Court persuaded by Plaintiffs' reliance on Kahn's deposition testimony in which he testified that under the RSA terms, he could "open [an] exact copycat" of his "Barrio concepts" if he wanted to, so long as it was not within 2.1 miles of another Barrio location. (Doc. No. 135-1, PageID# 2754.) The RSA did not forbid Kahn from opening *any* Mexican restaurant or utilizing the build-your-own taco concept *ever*. Instead, the RSA placed certain restrictions on when and where Defendants could open a Mexican restaurant, and restricted Defendants from using specific pieces of Barrio intellectual property, including its name, slogan, and trademarks. Moreover, Plaintiffs were aware that Defendants intended to open another restaurant *at the time they entered into the RSA*. (*See* Doc. No. 114-6, PageID# 1791.) Had Plaintiffs wanted to restrict Defendants' use of the build-your-own taco concept, they could have negotiated for a more stringent restriction in 2014. Plaintiffs do not identify sufficient evidence to establish a genuine issue of fact as to whether Defendants never intended to abide by the RSA terms.

Defendants' Motion for Summary Judgment is granted with respect to Plaintiffs' fraud and conspiracy to commit fraud claim.

### E. Counts 3, 6, 7, 8, and 9 are Abandoned

Plaintiffs' Second Amended Complaint contains the following counts against Defendants: claim 3, misappropriation of trade secrets in violation of the Ohio Uniform Trade Secrets Act, O.R.C §§ 1333.61, *et seq.*; count 6, tortious interference with a business relationship against Defendants Adams and DeSantis; count 7, tortious interference with a contract against Defendants Adams and DeSantis; count 8, temporary and permanent injunction; and count 9, copyright infringement. (Doc.

No. 53, ¶¶ 81-88, 102-42.)  However, Plaintiffs failed to respond to Defendants' arguments in their Motion regarding counts 3 and 6-8.  (*See* Doc. No. 121.)  Moreover, in their Opposition, Plaintiffs indicate that they are "voluntarily dismissing" count 9, their copyright infringement claim.  (*Id.* at PageID# 2425.)  As such, the Court finds that Plaintiffs have abandoned counts 3, 6, 7, 8, and 9 and concludes that summary judgment in favor of Defendants is appropriate on these counts.  As the Sixth Circuit has recognized, its "jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment."  *Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013); *see also Wierengo v. Akal Sec., Inc.*, 580 F. App'x 364, 369 n.1 (6th Cir. 2014) ("Akal moved for summary judgment on Wierengo's federal-and state-law claims.  Wierengo did not discuss her state-law claims in her response brief, and the district court held that they were abandoned.  We agree."); *Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011) ("The district court properly declined to consider the merits of this claim because Hicks failed to address it in either his response to the summary judgment motion or his response to Concorde's reply brief.").  Accordingly, Defendants' Motion for Summary Judgment is granted with respect to Plaintiffs' claims of misappropriation of trade secrets, tortious interference with a business relationship, tortious interference with a contract, temporary and permanent injunction, and copyright infringement.

## F.    Defendants' Counterclaims

Having found summary judgment in favor of Defendants is warranted on all of Plaintiffs' claims, the Court declines to exercise supplemental jurisdiction over Defendants' remaining state law counterclaims for breach of contract, negligent misrepresentation, and fraud.  (Doc. No. 58, ¶¶ 43-58, 68-75.)

Pursuant to 28 U.S.C. § 1367(c)(3), district courts may decline to exercise supplemental jurisdiction over state law claims once they have dismissed all claims over which they had original jurisdiction. Additionally, "[i]n determining whether to retain jurisdiction over state-law claims, a district court should consider and weigh several factors, including the 'values of judicial economy, convenience, fairness, and comity.'" *Gamel v. City of Cincinnati*, 625 F.3d 949, 951 (6th Cir. 2010) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). "[A] district court has broad discretion to decide whether to exercise jurisdiction over state law claims." *Smith v. Erie Cty. Sheriff's Dep't*, 603 F. App'x 414, 424 (6th Cir. 2015). However, "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed." *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996); *accord Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) ("[A] federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims.").

Here, the Court uses its "broad discretion" in deciding not to exercise supplemental jurisdiction over the remaining state law counterclaims. *Smith*, 603 F. App'x at 424. As other courts have recognized, "[t]he interest in avoiding needless decisions on state-law issues as a matter of comity weighs heavily against supplemental jurisdiction." *Howell v. Buckeye Ranch, Inc.*, No. 2:11-cv-1014, 2013 WL 1282518, at *8 (S.D. Ohio Mar. 27, 2013); *see also Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 522 (6th Cir. 2007) (noting "the Supreme Court's general comity-related principle that residual supplemental jurisdiction be exercised with hesitation, to avoid needless decisions of state law"); *White v. City of Cleveland, et al.*, No. 1:17-CV-01165, 2020 WL 7640932, at *24 (N.D. Ohio Dec. 23, 2020). The Court declines to weigh in on Defendants' counterclaims,

which implicate only issues of state law. Moreover, should Defendants choose to refile their counterclaims in state court, there is no indication that litigating in state court would cause any additional inconvenience to the parties, particularly since these parties have previously litigated against each other in Ohio state court. *(See* Doc. No. 137-1, PageID# 3090.) Litigating in state court will be at least as convenient for the parties and witnesses as litigating in this Court, which is in the same location. *See Fox v. Brown Memorial Home, Inc.*, 761 F. Supp. 2d 718, 725 (S.D. Ohio 2011). Moreover, there is no reason the parties' discovery cannot be made available for possible state court proceedings. *Id.*

The Court is cognizant that certain considerations relevant to the factors of judicial economy, fairness, and comity do tend to somewhat support retaining jurisdiction. For example, this action has been pending in federal court for nearly three years, discovery has closed, and the parties have fully briefed motions for summary judgment. However, such things are common in situations in which courts have declined to exercise jurisdiction. *Lloyd v. Midland Funding, LLC*, No. 3:12-CV-566-TAV-HBG, 2016 WL 3129199, at *2 (E.D. Tenn. June 2, 2016) (noting that "[w]hen a court rules on a motion for summary judgment, it is commonplace for the case to have been in litigation for many years, for the parties to have completed discovery, and for the case to be on the eve of trial," but that the court "has regularly declined to exercise supplemental jurisdiction over state-law claims at that stage in litigation"); *see also Packard v. Farmers Ins. Co. of Columbus Inc.*, 423 F. App'x 580, 585 (6th Cir. 2011) (affirming remand of state law claims despite the fact that the case had been pending for over three years); *see also White*, 2020 WL 7640932, at *24 (dismissing remaining state law claims in a case in which the parties had fully briefed motions for summary judgement and that had

been pending for over three years). The Court concludes these concerns do not outweigh the issues of comity and the importance of avoiding needless decisions of state law whenever possible.

Accordingly, the Court declines to exercise supplemental jurisdiction over Defendants' counterclaims. Plaintiffs' Motion for Partial Summary Judgment as to Defendants' counterclaims is denied without prejudice to any right Plaintiffs may have to refile such a motion in possible state court proceedings.

**IV.    Conclusion**

Accordingly, for the reasons set forth above, Defendants' Motion for Summary Judgment is GRANTED. Plaintiffs' Motion for Partial Summary Judgment is DENIED.

**IT IS SO ORDERED.**


                                          _s/Pamela A. Barker_____
                                          PAMELA A. BARKER
Date:  July 9, 2021                       U. S. DISTRICT JUDGE